24CA1358 Peo v Burkhalter 06-04-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA1358
Boulder County District Court No. 21CR1710
Honorable Nancy W. Salomone, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Bryan Andrew Burkhalter,

Defendant-Appellant.

---

JUDGMENT AFFIRMED IN PART AND VACATED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division III
Opinion by JUDGE MOULTRIE
Dunn and Harris, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced June 4, 2026

---

Philip J. Weiser, Attorney General, Caitlin E. Grant, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Polansky Law Firm, PLLC, Lisa A. Polansky, Boulder, Colorado, for
Defendant-Appellant

¶ 1 Defendant, Bryan Andrew Burkhalter, appeals the district court's judgment of conviction entered after a jury found him guilty of two counts of sexual assault. He also appeals the court's sexually violent predator (SVP) designation. We conclude that the court incorrectly designated Burkhalter an SVP. We therefore vacate that portion of the sentence and remand for correction of the mittimus. In all other respects, we affirm.

I. Background

¶ 2 In 2021, Burkhalter and the victim matched on Tinder, a dating application. They spent several weeks exchanging messages, and the victim eventually suggested that they meet in person. She gave Burkhalter her home address, and Burkhalter picked her up in his car.

¶ 3 The two ate dinner at a sandwich shop, then went to hang out at a nearby creek. Burkhalter repeatedly groped the victim throughout the date; the victim claimed she swatted Burkhalter's hand away each time but didn't otherwise tell him to stop, while Burkhalter asserted that the victim was receptive to his actions. Burkhalter eventually suggested that they go back to the victim's apartment, and the victim agreed.

¶ 4    Excluding the groping, the victim's and Burkhalter's testimony mostly aligned up to this point.  But they presented drastically different accounts of what happened in the victim's apartment.  The victim said that Burkhalter suddenly shoved his penis in her mouth, then carried her to her bedroom where he began to vaginally penetrate her with his penis.  Burkhalter then switched to anally penetrating the victim, at which point she, for the first time, clearly expressed that she didn't consent.  Burkhalter nevertheless continued to anally penetrate her and afterward vaginally penetrated her again.  Burkhalter didn't deny engaging in these sex acts with the victim but claimed that they were consensual, that the victim never withdrew her consent, that he immediately stopped when the victim began to pull away and express discomfort after anal penetration, and that he began to vaginally penetrate her again only after it appeared to him that she was aroused again.

¶ 5    The next day, the victim reported the assault to the police and was evaluated by a sexual assault nurse examiner (SANE).  The SANE's examination revealed a small bruise and scratches on the victim's knees and hip, as well as anal and vaginal injuries consistent with penetration.  However, the SANE later testified at

trial that, "[t]ypically[,] with intercourse, whether it's consensual or nonconsensual, you would see injuries."

¶ 6 The People charged Burkhalter with two counts of sexual assault (submission against will – use of force) under section 18-3-402(1)(b), (4)(a), C.R.S. 2021[1] — one count corresponding to the anal penetration and the other to the vaginal penetration after the victim vocalized her lack of consent. A jury found him guilty as charged.

## II. Discussion

¶ 7 Burkhalter contends that the district court reversibly erred by (1) denying his pretrial motions to introduce evidence of the victim's sexual conduct; (2) allowing the prosecutor to elicit victim impact testimony at trial; (3) allowing a police officer not tendered or qualified as an expert witness to provide expert testimony; and (4) not allowing him to obtain new private counsel after his retained attorneys moved to withdraw. He further contends that the cumulative effect of these errors deprived him of his due process

---

[1] The definition of sexual assault in section 18-3-402(1)(a), C.R.S. 2021, was amended in 2022. Ch. 41, sec. 1, § 18-3-402, 2022 Colo. Sess. Laws 214. We therefore apply the version of the statute that was in effect at the time of the offense.

right to a fair trial. Finally, he contends that the district court's postconviction SVP determination was erroneous. We agree the court erred by designating Burkhalter an SVP, but we reject his other contentions.

### A.    Evidence of the Victim's Sexual Conduct

¶ 8    Burkhalter contends that the district court abused its discretion by denying his motions to admit certain evidence under section 18-3-407, C.R.S. 2023 (the rape shield statute).[2] As we understand his argument, Burkhalter asserts that the evidence was either admissible under section 18-3-407(1)(b) or was otherwise admissible because it was relevant to a material issue in the case. He argues that the court's exclusion of this evidence deprived him of his constitutional right to present a defense and confront witnesses. We aren't persuaded.

---

[2] The rape shield statute has been amended since Burkhalter's trial. *See* Ch. 123, sec. 2, § 18-3-407, 2024 Colo. Sess. Laws 408-10. We apply the version of the statute in effect at the time of trial. *See People v. Ramcharan*, 2024 COA 110, ¶ 2.

### 1.    Additional Background

¶ 9     Before trial, Burkhalter filed three motions to introduce the following evidence:

- One motion sought to introduce message logs of a Tinder conversation that the victim had before the sexual assault in which she expressed to an unidentified person a willingness to engage in anal sex, but "only in certain moods" (pre-assault messages).

- Another proffered messages from three other Tinder conversations the victim had the night of and the morning after the sexual assault.  In each conversation, an unidentified person asked to meet up with the victim, and the victim made an excuse and declined (post-assault messages).

- The third requested to admit information from the SANE's examination report that "revealed the presence of unknown male DNA which did not belong to [Burkhalter]" and the victim's statements to the SANE that the victim "had consensual sex with another

partner . . . one day prior to the allegations against [Burkhalter]."

¶ 10    The district court denied the motions, concluding that the proffered evidence was presumptively irrelevant under the rape shield statute and logically irrelevant to the issue of whether the victim consented to Burkhalter's sexual acts.

### 2.    Standard of Review and Applicable Law

¶ 11    We review a district court's evidentiary rulings, including under the rape shield statute, for an abuse of discretion. *People v. Hood*, 2024 COA 27, ¶ 6. A district court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair or when it misapplies the law. *Id.*

¶ 12    The purpose of the rape shield statute is to protect sexual assault victims from humiliating public fishing expeditions into their sexual conduct. *People in Interest of K.N.*, 977 P.2d 868, 874 (Colo. 1999). It does so by deeming most evidence of a victim's prior or subsequent sexual conduct presumptively irrelevant. *See* § 18-3-407(1); *People v. Weiss*, 133 P.3d 1180, 1185 (Colo. 2006).

¶ 13    But there are exceptions to this presumption. One exception allows a defendant to introduce evidence of specific instances of

sexual activity showing the source or origin of semen, disease, or any similar evidence of sexual intercourse for the purpose of showing that the defendant didn't commit the acts charged. § 18-3-407(1)(b); *People v. Sims*, 2019 COA 66, ¶ 45. If evidence doesn't fall into that exception, a defendant may still overcome the presumption of irrelevance if the court finds, based on a defendant's offer of proof, that the evidence is relevant to a material issue to the case. *See* § 18-3-407(2)(a), (e); *Sims*, ¶ 45.

¶ 14     Evidence that falls within an exception to the rape shield statute is still subject to relevancy limitations under CRE 401. *Sims*, ¶ 45. Evidence is relevant if it makes "the existence of a fact of consequence more or less probable." *Hood*, ¶ 19; CRE 401.

### 3.     None of the Proffered Evidence Overcame the Presumption of Irrelevance

¶ 15     Burkhalter argues that the evidence of the victim's consensual sexual encounter the day before the assault was relevant to establish that someone other than Burkhalter caused her injuries, particularly as it concerned the jury's determination whether he had overcome the victim's will by physical force. *See* § 18-3-402(4)(a) (sexual assault is a class 3 felony instead of a class

4 felony if "[t]he actor causes submission of the victim through the actual application of physical force or physical violence").

¶ 16     But in *People v. Harris*, 43 P.3d 221 (Colo. 2002), the Colorado Supreme Court considered similar evidence offered for a similar purpose and concluded that it was inadmissible under the rape shield statute.

¶ 17     In *Harris*, the defendant was charged with sexual assault and, like Burkhalter, "contended that the sexual encounter with [the victim] was consensual, and was not an assault by force or violence." *Id.* at 223. The prosecution moved to exclude evidence that the victim had consensual sex four days before the assault as barred under the rape shield statute. *Id.* The defendant objected, arguing that the evidence was admissible under section 18-3-407(1)(b) because "the prior sexual encounter could account for" an abrasion discovered during a SANE's examination "and would, inferentially, support his defense that his sexual encounter with [the victim] was consensual." *Id.*

¶ 18     The supreme court concluded that the evidence "was not logically relevant to the question of whether [the defendant] committed sexual assault" and was "properly excluded . . . under

the rape shield statute's presumption of irrelevance."  *Id.* at 226.

The court reasoned that

> [i]f the jury accepted [the defendant's] theory that consensual intercourse could have caused the abrasion, then the question of who caused the abrasion was irrelevant to whether [the defendant] used force.  Alternately, if the jury believed that only nonconsensual intercourse could have caused the abrasion, then evidence of [the victim's] consensual intercourse with her boyfriend was irrelevant to whether [the defendant] used force.  Thus, in light of [the defendant's] defense of consent and [a SANE's] testimony that consensual intercourse could have caused the abrasion, evidence that [the victim] had consensual intercourse with her boyfriend four days before her encounter with [the defendant] is not logically relevant to whether [the defendant] committed sexual assault.

*Id.*  Put differently, the defendant's proffered evidence that the victim recently had sex with someone else didn't illuminate whether the defendant committed sexual assault.  *See id.*  We agree with the district court that "[t]he proposed evidence in this case is on all fours with the analysis set forth in *Harris.*"

¶ 19     Nevertheless, Burkhalter attempts to distinguish the circumstances of this case from those in *Harris.*  In his opening brief, Burkhalter argues that the supreme court "based its ruling on

its conclusion that 'even if the prior encounter [with the victim's committed sexual partner] had caused the abrasion, it likely would have healed in the intervening days because vagina tissue . . . heals rather fast.'" He argues that here, in contrast, the victim's prior sexual encounter occurred twenty-four hours before the sex with Burkhalter, which was "insufficient time for healing." We reject this argument because the court's analysis in *Harris* wasn't based on the fact that the victim's abrasion could have already healed, as evidenced by the court's conclusion that "proof that another sexual partner was a potential, or even the actual, source of [the victim's] abrasion was not evidence that [the defendant] did not commit the act charged." *Id.* at 227.

¶ 20    We likewise reject Burkhalter's argument that the circumstances of this case differ from those in *Harris* because the prosecution here highlighted the victim's injuries "to prove lack of consent and force." He asserts that, "in order to effectively rebut that notion, the defense needed to be able to present information that another sexual partner of the victim had possibly caused the injury though either non-consensual or consensual sex." But while the prosecution emphasized that the victim expressed pain when

Burkhalter anally penetrated her, we disagree that the prosecution suggested the victim's injuries proved that she didn't consent or that Burkhalter used physical force against her. Indeed, the prosecution intentionally elicited testimony from the SANE that the injuries had no bearing on whether the sexual acts were consensual. Thus, evidence that the victim had sex with another person, whether consensual or not, would have at most shown that Burkhalter may not have caused the victim's genital injuries, but it wouldn't make it more or less likely that Burkhalter sexually assaulted the victim. *See id.* at 226.

¶ 21 Burkhalter also argues that the court erred by excluding the third-party DNA evidence because it was subject to section 18-3-407(1)(b)'s exception. But as the district court found, the presence of DNA doesn't necessarily mean "that it was deposited there by sexual contact." The court also found that because "the disputed issue [for trial] [was] not identification or fact of sexual contact, but rather whether that sexual contact was consensual or not consensual, or forceful or not forceful," the prejudice of presenting such information substantially outweighed its probative value. And Burkhalter fails to explain on appeal how the third-party DNA

11

evidence falls within section 18-3-407(1)(b)'s exception or is logically relevant to the determination of whether he sexually assaulted the victim. His argument is therefore underdeveloped, and we won't consider it further. *See People v. Cuellar*, 2023 COA 20, ¶ 44 (we don't address underdeveloped arguments).

¶ 22 Finally, Burkhalter fails to explain why the Tinder messages — which don't show the source or origin of evidence of sexual intercourse — fit within the exception under section 18-3-407(1)(b). We conclude that they don't. He also doesn't explain why they were materially relevant.

¶ 23 Regarding the pre-assault Tinder messages, we agree with the district court that whether the victim was amenable "to having anal sex on another occasion with another person is . . . logically irrelevant to the question of whether [she] consented to any kind of sex with [Burkhalter] on the offense date." Likewise, regarding the post-assault messages, we agree with the district court that "[w]hether or not [the victim] was invited to have sexual relations with another person on the offense date is . . . logically irrelevant to the question of whether [the victim] consented to any kind of sex

with [Burkhalter]." Accordingly, we don't consider this argument further. *See Cuellar*, ¶ 44.

### 4. The District Court Didn't Impermissibly Infringe on Burkhalter's Constitutional Right to Present a Defense

¶ 24 Burkhalter additionally asserts that the court's exclusion of evidence regarding the victim's prior consensual encounter, the third-party DNA evidence, and the pre- and post- assault messages prevented him from presenting a defense, including by improperly limiting his ability to cross-examine the victim to challenge her credibility. We aren't persuaded.

¶ 25 A criminal defendant has the constitutional right to a meaningful opportunity to present a complete defense. *People v. Elmarr*, 2015 CO 53, ¶ 26. This includes the right to confront witnesses. *Merritt v. People*, 842 P.2d 162, 165 (Colo. 1992). But "[n]ot every evidentiary ruling that affects a defendant's ability to challenge the credibility of the evidence against him amounts to a constitutional error." *People v. Conyac*, 2014 COA 8M, ¶ 108; *see also Elmarr*, ¶ 27 ("[T]he right to present a defense is generally subject to, and constrained by, familiar and well-established limits on the admissibility of evidence.").

13

¶ 26    Whether a court's evidentiary rulings violated a defendant's right to confront witnesses or present a defense is "dependent upon the extent to which he was permitted to subject the prosecutor's case to 'meaningful adversarial testing.'" *Krutsinger v. People*, 219 P.3d 1054, 1062 (Colo. 2009) (quoting *Crane v. Kentucky*, 476 U.S. 683, 691 (1986)).

¶ 27    The record doesn't indicate that the court's ruling deprived Burkhalter of his only means to present his consent defense, test significant prosecution evidence, or impeach the victim's credibility. During cross-examination, defense counsel questioned the victim extensively about inconsistencies between her trial testimony and what she told friends, family, and police shortly after the assault. Defense counsel also challenged the victim's recollection and perspective of the events leading up to the assault, given the victim's admission to drinking alcohol and smoking marijuana before the assault. Indeed, defense counsel elicited testimony from the victim that she hadn't verbalized her lack of consent to many of Burkhalter's actions. Burkhalter also presented an expert witness who opined that the injuries identified in the SANE's examination

report could be the result of either consensual or nonconsensual intercourse.

¶ 28 In sum, we conclude that the district court didn't abuse its discretion by excluding Burkhalter's proffered evidence of the victim's alleged sexual conduct because it was irrelevant, and the court's exclusion of it didn't impermissibly infringe on Burkhalter's right to present a defense or confront witnesses.

## B. Victim Impact Evidence

¶ 29 Burkhalter contends that the district court erred by allowing extensive testimony about the victim's reaction to the assault because it was irrelevant impact evidence and was unfairly prejudicial. We disagree.

### 1. Additional Background

¶ 30 During direct examination, the victim testified that, after Burkhalter left on the night of the assault, she "took [her] futon and flattened it out all the way and pushed it up against the door" to her apartment. She also said that the night after the assault, she had a friend "stay[] at [her] house . . . because [she] was really scared to stay alone." And during redirect examination, the victim said that, in the days after the assault, she "had [her] apartment manager

15

come and change the latch code on the" electronic lock to her apartment door and that "everywhere [she] went, [she] carried [her] pepper spray with [her], even to the laundry room."

¶ 31    The victim's sister testified that when the victim called her the day after the assault to explain what happened, the victim seemed to be "in shock" and sounded "outside of herself" as if "it didn't seem real."

¶ 32    The victim's ex-boyfriend testified that the victim contacted him after the assault and asked for his help "to buy a gun to protect herself and to get her concealed carry permit" because she "[didn't] feel safe anywhere anymore." He also said that the victim would often "make light of the situation" or make jokes when in "difficult or emotional situations."

¶ 33    A police detective testified that the victim described the assault as "a very difficult event in her life." He said that the victim told him that "she was struggling" because "[s]he didn't have family" in Colorado and that "she was very concerned for her safety" because Burkhalter "had her address and knew where she lived."

¶ 34    During a bench conference, the court sua sponte raised concerns "about the line between relevant evidence and victim

16

impact evidence." The next day, defense counsel objected to the admission of any additional victim impact testimony and moved for a mistrial based on the testimony already admitted. Defense counsel argued that the jury wouldn't be able to figure out whether the victim became "depressed or despondent after . . . being violently raped" or because she "consented and then regretted things."

¶ 35 In overruling the objection and denying the motion for a mistrial, the district court recognized that "the concept of fear-based behavioral changes [is] different from general suffering of despondency, depression." Thus, the court concluded that "specific events close in time [to the offense] that demonstrate the existence of fear" were relevant and admissible, but it prohibited testimony about "generalized depression and changes in behavior, particularly when it [was] not tied close in time to the offense."

2. Standard of Review and Applicable Law

¶ 36 District courts have broad discretion in determining the admissibility of evidence. *Elmarr*, ¶ 20. A court abuses that discretion when its ruling is based on an erroneous view of the law or is manifestly arbitrary, unreasonable, or unfair. *Id.*

¶ 37    Relevant evidence is presumptively admissible.  CRE 402.  "In criminal cases, evidence is relevant if the evidence makes it more or less probable that a criminal act occurred, the defendant was the perpetrator, or the defendant acted with the necessary criminal intent."  *People v. Mena*, 2025 COA 14, ¶ 15 (quoting *People v. Clark*, 2015 COA 44, ¶ 17).  But even relevant evidence must be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.  CRE 403.  Evidence is unfairly prejudicial if it encourages a jury to reach a verdict on an improper basis, such as "sympathy, hatred, contempt, retribution, or horror."  *People v. Valdez*, 2017 COA 41, ¶ 37 (quoting *People v. Dist. Ct.*, 785 P.2d 141, 147 (Colo. 1990)).

¶ 38    Victim impact evidence is that which relates to the physical, emotional, or social impact of a crime on its victim.  *People v. Martinez*, 2020 COA 141, ¶ 29.  Whether victim impact evidence is admissible depends on its relevance to the determination of whether the defendant committed the charged offense.  *Id.* at ¶ 33.  Victim impact evidence is admissible during the guilt/innocence phase of a trial if it "tends to show the context or circumstances of the crime

itself." *Id.* at ¶ 34 (quoting *State v. Graham*, 650 S.E.2d 639, 646 (N.C. Ct. App. 2007)).

### 3. The District Court Didn't Abuse Its Discretion by Admitting the Victim Impact Evidence

¶ 39 Burkhalter argues that the extensive testimony about the victim's reaction to the assault was irrelevant and unfairly prejudicial because it "undoubtedly injected sympathy into deliberations in an otherwise weak case." We conclude that, even assuming the testimony was victim impact evidence, it was relevant and not unduly prejudicial.

¶ 40 At the time of Burkhalter's conviction, section 18-3-402(1)(a) said that a person who knowingly inflicts sexual intrusion or sexual penetration commits sexual assault when the person "causes submission of the victim by means of sufficient consequence reasonably calculated to cause submission against the victim's will." In other words, the central focus of the charges was whether the sexual act was against the victim's will, meaning she didn't consent. Testimony that the victim didn't feel safe and took steps to protect herself was therefore relevant to determining Burkhalter's guilt.

¶ 41  Burkhalter's theory at trial was that the victim fabricated her allegations against him because she regretted their consensual sexual encounter.  From opening statements through closing arguments, defense counsel attacked the victim's credibility.  Testimony about the victim's fear after the assault thus had some tendency to make it less probable that she fabricated the allegations.  *See People v. Haymaker*, 716 P.2d 110, 113-14 (Colo. 1986) (testimony that the victim was fearful and distraught for several months after she was sexually assaulted was admissible because it went to the victim's credibility that she didn't consent to the sexual encounter).  The impact evidence here was therefore relevant to rebut Burkhalter's consent-fabrication defense and made it more probable that Burkhalter was the perpetrator of the charged criminal act.  *See Mena*, ¶¶ 20-22 (victim impact evidence was relevant to whether the victim's sexual assault accusations were true or fabricated because her credibility "was the linchpin of the case").

¶ 42  And this evidence was not unduly prejudicial under CRE 403.  The district court didn't allow testimony about "generalized depression and changes in behavior"; rather, the testimony was

20

about "specific events close in time [to the offense] that demonstrate[d] the existence of fear." Burkhalter doesn't explain how this testimony was so shocking as to be unduly prejudicial or to substantially outweigh the evidence's relevance. *See People v. Brown*, 2022 COA 19, ¶ 70 ("Unfair prejudice [in CRE 403] does not mean prejudice that results from the legitimate probative force of the evidence.").

¶ 43   Instead, Burkhalter argues that the "sheer volume" of victim impact evidence is what was prejudicial. But evidence isn't unduly prejudicial just because it's cumulative. *See People v. Morrison*, 985 P.2d 1, 6-7 (Colo. App. 1999), *aff'd*, 19 P.3d 668 (Colo. 2000) (allowing eight witnesses to testify about statements made by the victims was not unduly prejudicial merely because it was repetitive). And the court instructed the jury that "[t]he number of witnesses testifying for or against a certain fact does not, by itself, prove or disprove that fact."

¶ 44   Thus, under the circumstances of this case, we conclude that the district court didn't err by admitting testimony concerning the victim's fear and steps she took to protect herself immediately after or in the days following the assault.

## C. The Detective's Testimony

¶ 45 At trial, the prosecutor asked the police officer who responded to the victim's home after the incident how he would describe the victim's demeanor. The officer said,

> I think the best way to describe it — I don't
> know if you've ever heard the thousand-yard
> stare where someone is, you know, you can tell
> that they're — there is anxiety they're having
> reliving that moment, talking. I remember a
> lot of the time, she was just kind of staring
> forward. And you could tell that the event was
> replaying. So I could feel that she had had
> something, you know, traumatic happen by
> her overall demeanor while we were speaking.

¶ 46 Burkhalter contends that this constituted unendorsed and unqualified expert testimony. We disagree.

¶ 47 Again, we review the district court's decision to admit evidence for an abuse of discretion. *Martinez*, ¶ 61.

¶ 48 A witness's testimony may be classified as lay opinion testimony or expert testimony. *People v. Murphy*, 2021 CO 22, ¶ 17. If the witness provides testimony that could be expected to be based on an ordinary person's knowledge or experiences, then they are offering lay opinion testimony. *Venalonzo v. People*, 2017 CO 9, ¶ 23. But if the witness provides testimony that could not be

offered without specialized knowledge, experiences, or training, then they are offering expert testimony. *Id.*

¶ 49  "Police officers regularly, and appropriately, offer testimony under CRE 701 based on their perceptions and experiences." *People v. Tallwhiteman,* 124 P.3d 827, 832 (Colo. App. 2005).  But an officer's testimony "becomes objectionable when what is essentially expert testimony is improperly admitted under the guise of lay opinions." *People v. Stewart,* 55 P.3d 107, 123 (Colo. 2002). However, merely referencing one's "training and experience" doesn't "transform an officer's lay opinion testimony into expert testimony." *Murphy,* ¶ 31.

¶ 50  We conclude that the officer's statements were proper lay opinion testimony.  The officer didn't base his observations of the victim's demeanor on any specialized training or experience, nor did the prosecutor elicit testimony from the officer about *any* specialized training or experience, let alone training or experience relevant to observing a victim's demeanor. *Cf. Martinez,* ¶¶ 67-68, 71 (a detective offered improper expert opinion testimony when he "began his testimony by summarizing his background, training, and experience" relevant to sexual assault investigations, and his

statement about the victim's demeanor was "based on his interviews of 'a fair number of victims'"). Moreover, an ordinary citizen without specialized knowledge or experience who has observed someone who recently experienced a disturbing event would be able to draw similar conclusions to those of the officer. *See Murphy*, ¶ 26 (concluding that an officer's testimony regarding inferences they drew from the body language of child witnesses was lay opinion testimony).

¶ 51 Accordingly, we conclude that the district court didn't err by allowing the challenged statement.

### D. Motion to Withdraw

¶ 52 Burkhalter contends that the district court reversibly erred by denying his trial counsels' motion to withdraw. We aren't persuaded.

### 1. Additional Background

¶ 53 Just over three months before the scheduled trial date, Burkhalter's privately retained defense counsel, consisting of lead

defense counsel and an associate at his firm,[3] moved to withdraw from the case due to "irreconcilable differences."  Burkhalter objected.

¶ 54     The district court held an ex parte hearing on the motion (conflict hearing).  At that hearing, lead defense counsel disclosed to the court that Burkhalter had sent him an email that lead defense counsel understood to mean that "if [counsel] returned the trial fee plus an additional $6,500," Burkhalter wouldn't resort to measures including grieving him and posting false reviews on his business website.  Lead defense counsel further noted that, even before receiving the email, he had irreconcilable differences with Burkhalter due to Burkhalter's manipulation, fraudulent representations, and attempts to persuade him to act unethically.

¶ 55     Burkhalter told the court that he originally objected to the motion to withdraw due to the expense of retaining new counsel who would need to get up to speed with his case.  But he then said

---

[3] Burkhalter was represented by three privately retained attorneys — lead counsel, an associate in lead counsel's firm, and a third co-counsel from a separate firm.  Burkhalter objected to lead counsel and the associate withdrawing.  He didn't object to co-counsel withdrawing.

he could no longer work with lead defense counsel because of what counsel said during the conflict hearing and therefore was no longer objecting to lead counsel's withdrawal.[4]  Burkhalter said that he had been in contact with new attorneys who had agreed to take his case but needed the court to grant a continuance for them to do so. The court took the matter under advisement.

¶ 56    At the next hearing, the court noted Burkhalter was represented by private counsel, and, under *Ronquillo v. People*, 2017 CO 99, ¶ 27, he could fire his attorneys without good cause. But given that the scheduled trial date was quickly approaching, the court applied the factors from *People v. Brown*, 2014 CO 25, ¶ 24, to determine whether to grant Burkhalter a continuance to retain new counsel.  The court made the following findings:

- Burkhalter was "highly motivated to delay this trial," and his desire to delay trial was the cause of many of the issues he was having with defense counsel.

- It had already been nearly three years since the sexual assault, and the continuance necessary for new counsel

---

[4] Although the associate was included in the motion to withdraw, there wasn't any discussion about him during the conflict hearing.

to adequately prepare would take at least six months, but more likely close to a year.

- Trial had already been continued four times, three of which were continuances "occasioned by the [d]efense."

- The prosecutor had been on the case since its inception and had "developed a significant relationship with the named victim."

- There were concerns about witnesses who resided out of state and others who were planning to move out of state.

- The request for a continuance was made close to the scheduled trial date, and the victim objected to the request.

Thus, the court concluded that all of the applicable *Brown* factors "point quite strongly against continuance, in terms of the interest of the justice system in resolving the matter, and the interest of the named victim, and her particular relationship with [the prosecutor], who would not be able to try [the] case were this case to be continued."

¶ 57 Next, the court observed that although lead defense counsel was worried that "Burkhalter would grieve him, or sue him, or

potentially make some online reviews that would have an adverse effect on [defense counsel's] business," Burkhalter was entitled to do all of those things. The court thus concluded that lead defense counsel didn't have an ethical conflict that required him to withdraw and that he would be able to adequately represent Burkhalter at trial. And the court noted that, even if it was mistaken and lead defense counsel did have a conflict, that conflict would be based on personal interest and wouldn't be imputed to the associate.

¶ 58 The district court then gave Burkhalter four options: (1) proceed to trial with both of his private attorneys; (2) fire lead defense counsel but proceed to trial with his other attorney, the associate; (3) fire both attorneys and proceed pro se; or (4) fire both attorneys, hire new counsel, and be prepared to proceed to trial as scheduled. Burkhalter elected to go to trial with both of his currently retained attorneys.

¶ 59 Midway through trial, the district court noted that it had watched Burkhalter's interactions with his counsel, especially his lead counsel, throughout the trial and had observed "a robust, communicative relationship between [lead counsel] and

[Burkhalter]." Thus, the court reiterated its prior ruling "that there [was] not and [had] never been a breakdown in communication between [Burkhalter] and [lead defense counsel]."

## 2. Standard of Review and Applicable Law

¶ 60    A court has broad discretion to determine whether to allow counsel in a criminal case to withdraw; it must exercise its discretion by balancing "the need for orderly administration of justice with the facts underlying the request." Crim. P. 44(c). We review a court's ruling on a motion to withdraw for an abuse of that discretion. *People v. DeAtley*, 2014 CO 45, ¶ 13.

¶ 61    Though a lawyer must move to withdraw if he believes his continued representation violates the Colorado Rules of Professional Conduct, *DeAtley*, ¶ 15, "[a] lawyer may withdraw from a case only upon order of the court," Crim. P. 44(d)(1). "When a retained defense attorney files a motion to withdraw under Crim. P. 44(c), the trial court necessarily must make an inquiry into the foundation for the motion when balancing 'the need for orderly administration of justice with the facts underlying the request.'" *DeAtley*, ¶ 15 (quoting Crim. P. 44(c)); *People in Interest of M.M.*, 726 P.2d 1108, 1121 (Colo. 1986).

¶ 62    "The Sixth Amendment to the United States Constitution affords a criminal defendant the right to be represented by counsel of choice." *People v. Gilbert*, 2022 CO 23, ¶ 19; *see* U.S. Const. amend. VI.  "A defendant's Sixth Amendment right to be represented by counsel of choice is 'entitled to great deference,'" and the district court accordingly "must 'recognize a presumption in favor of a defendant's choice of retained counsel.'"  *Gilbert*, ¶ 19 (first quoting *Rodriguez v. Dist. Ct.*, 719 P.2d 699, 705 (Colo. 1986); and then quoting *Ronquillo*, ¶ 17).

¶ 63    However, "the right to counsel of choice is not absolute."  *Id.* at ¶ 20.  For example, a defendant may fire retained counsel without good cause, but the district court must then determine whether to grant a continuance that would provide replacement counsel with sufficient time to take over the case.  *Id.* at ¶ 22.  In making this determination, the court "must balance the defendant's Sixth Amendment right to counsel of choice with the public's interest in the efficiency and integrity of the judicial process."  *Id.* at ¶ 21.  Courts attempting to strike this balance consider various factors, depending on the specific facts of the case, including

30

- the defendant's actions surrounding the request and the apparent motive for the request;

- the availability of chosen counsel and the length of continuance necessary to accommodate chosen counsel;

- the potential prejudice of a delay to the prosecution beyond mere inconvenience;

- the inconvenience to witnesses;

- the timing of the request to continue; and

- the impact of the continuance on the court's docket.

*Id.* (citing *Brown*, 2014 CO 25, ¶ 24). These *Brown* factors are not exhaustive, and the district court need not make explicit findings as to each one. *Id.* at ¶ 26.

¶ 64    We review the district court's decision whether to grant a continuance for an abuse of discretion. *Brown*, 2014 CO 25, ¶ 19. We will reverse the court's ruling only if, based on the totality of the circumstances, it was arbitrary or unreasonable and materially prejudiced the defendant. *Gilbert*, ¶ 18. We will defer to the court's factual findings if they have record support. *Brown*, 2014 CO 25, ¶ 26.

¶ 65    If the district court determines that a defendant isn't entitled to a continuance, the court "must require the defendant to choose between keeping retained counsel or waiving the right to counsel and proceeding pro se." *Gilbert*, ¶ 22.

### 3. The District Court Didn't Err in Its Handling of the Motion to Withdraw

¶ 66    Burkhalter asserts that the district court erred by denying defense counsels' motion to withdraw. He also appears to contend that the court erred by denying his request for a continuance to retain new counsel because the court improperly applied the *Brown* factors. We disagree with both points.

¶ 67    With respect to the motion to withdraw, Burkhalter asserts that the district court abused its discretion because it dismissed lead defense counsel's concerns "as within the normal bounds" of a contentious attorney-client relationship and without additional legal reasoning. We disagree.

¶ 68    The district court directly addressed these concerns when it acknowledged that, standing alone, Burkhalter's threats to grieve, sue, or poorly review lead defense counsel didn't create a conflict of interest. *See DeAtley*, ¶ 29 ("[W]hile filing a malpractice or ethical

32

claim against defense counsel may, under limited circumstances, be said to create a 'conflict of interest' for defense counsel, such a 'conflict of interest' clearly does not arise from filing an action against counsel alone . . . ." (Coats, J., concurring in part and dissenting in part)).  And Burkhalter's disagreements with his counsels' trial preparation, strategy, or tactics were insufficient to establish good cause.  *See People v. Kelling*, 151 P.3d 650, 653 (Colo. App. 2006); *see also People v. Bergerud*, 223 P.3d 686, 693 (Colo. 2010) ("On issues of trial strategy, defense counsel is 'captain of the ship.'" (quoting *Arko v. People*, 183 P.3d 555, 558 (Colo. 2008))).  Likewise, animosity between a defendant and their defense counsel doesn't amount to an actual conflict of interest.  *See People v. Arguello*, 772 P.2d 87, 92 (Colo. 1989); *People v. Hodges*, 134 P.3d 419, 425 (Colo. App. 2005), *aff'd on other grounds*, 158 P.3d 922 (Colo. 2007).  Thus, we can't conclude that the court abused its discretion by denying defense counsels' motion to withdraw.

¶ 69     Burkhalter also argues that the district court afforded undue weight to the bond that the victim had with the prosecutor and erroneously concluded that he was attempting to delay trial by

asking for three previous continuances. He doesn't contest the court's analysis as to other *Brown* factors.

¶ 70 Burkhalter asserts that "[p]rivileging the supposed 'bond' between accusers and their favorite [district] attorney, over and above Sixth Amendment protections, was wholly arbitrary and unfair." But *Brown* instructs courts to consider factors including "the potential prejudice of a delay to the prosecution beyond mere inconvenience"; "the inconvenience to witnesses"; and "the victim's position, if the victims' rights act applies." *Brown*, 2014 CO 25, ¶ 24. The court's statements about the victim and prosecutor thus fit squarely within the *Brown* factors, and we can't conclude that the court abused its discretion. And to the extent that Burkhalter argues that the court erroneously considered factors beyond those contemplated by *Brown*, his argument is underdeveloped and conclusory, so we don't address it. *See Cuellar*, ¶ 44.

¶ 71 Additionally, the district court's findings that the trial had already been continued several times at Burkhalter's request and that his disputes with his attorneys contributed to trial delays are supported by the record, so we won't disturb them. *See Brown*, 2014 CO 25, ¶ 26. Moreover, Burkhalter doesn't challenge the

court's determination that it would take a continuance of at least six months to a year for new counsel to prepare for trial, which would significantly prejudice the prosecution as the case had been pending for nearly three years.

¶ 72 Accordingly, we conclude that the court didn't abuse its discretion by denying Burkhalter's request for a continuance to retain new counsel.

## E. Cumulative Error

¶ 73 We reverse for cumulative error only when a district court's errors, viewed in the aggregate, deprived the defendant of a fair trial. *Howard-Walker v. People*, 2019 CO 69, ¶ 40. Because we conclude that the district court didn't make any pretrial or trial errors, Burkhalter's cumulative error claim fails. *See People v. Villa*, 240 P.3d 343, 359 (Colo. App. 2009) (cumulative error analysis is required only when multiple errors have been identified).

## F. SVP Designation

¶ 74 Finally, Burkhalter contends that the district court incorrectly designated him an SVP because there was no evidence that he promoted a relationship with the victim for the purpose of sexually victimizing her. We agree and vacate the designation.

### 1.  Additional Background

¶ 75    The district court issued a written order designating Burkhalter an SVP after receiving briefing from both parties.  In its order, the court made the following factual findings:

- Burkhalter "regarded the 'Tinder' social media platform as an app for individuals looking to connect and arrange to meet up for sexual activity, and this was the purpose for which he intended to connect with" the victim.

- Burkhalter "repeatedly inserted sexual overtones and advances into his text conversations with [the victim], including when she was not responsive or attempted to redirect these."

- "[O]n the date of offense, which was [Burkhalter] and [the victim's] first in-person meeting, [Burkhalter] initiated inappropriate sexual contact with the victim almost immediately upon meeting her (e.g. grabbing her vaginal area at the start of their date)."

- Burkhalter "ignored [the victim] rebuffing physical contact (e.g. grabbing at her breasts and buttocks at the

creek, despite [the victim] pushing his hands away) and continued his physical advances."

- "[I]mmediately after the offense, [the victim] confronted [Burkhalter] by text message, saying that he had persiste[d] in anal intercourse when she had said 'no'. In the days and weeks after this confrontation, [Burkhalter] sent two memes that taunted [the victim] about the anal intercourse to which she had clearly told him she did not consent."

¶ 76 The court concluded that these facts were insufficient to demonstrate that Burkhalter "began the relationship with [the victim] for the purpose of sexual victimization, as opposed to simply for sexual gratification." But the court found that these facts established that Burkhalter "repeatedly increased and progressed the sexual relationship, sometimes over [the victim's] objections, culminating in the sexual assault for which he was convicted." And the court concluded that Burkhalter's act of sending "taunting memes after [the victim] confronted him regarding her lack of consent suggest[ed] an ongoing intent to victimize."

¶ 77　　Thus, the court held that the listed facts were "sufficient for the [c]ourt to conclude that [Burkhalter] advanced the already sexual nature of the relationship for the purpose of victimization." Accordingly, the court determined that Burkhalter met the statutory requirements to be designated an SVP.

### 2.　Standard of Review and Applicable Law

¶ 78　　A district court's SVP designation presents a mixed question of fact and law. *Allen v. People*, 2013 CO 44, ¶ 4. We defer to the court's factual findings if they have record support, and we review the court's legal conclusions de novo. *Id.*

¶ 79　　Under section 18-3-414.5, C.R.S. 2025, the court may designate a defendant an SVP if, as relevant here, the victim was "a person with whom the offender established or promoted a relationship primarily for the purpose of sexual victimization." § 18-3-414.5(1)(a)(III). "[A]n SVP designation [must] be based on 'reliable evidence, not speculation or unfounded allegations.'" *People v. Lopez*, 2020 COA 41, ¶ 8 (quoting *People v. Tuffo*, 209 P.3d 1226, 1231 (Colo. App. 2009)).

¶ 80　　An offender promotes a relationship if, "excluding the offender's behavior during the commission of the sexual assault

38

that led to his conviction, he otherwise encouraged a person with whom he had a limited relationship to enter into a broader relationship primarily for the purpose of sexual victimization." *People v. Gallegos*, 2013 CO 45, ¶ 14. Put differently, a defendant promotes a relationship when "he and the victim have had a previous relationship, which was limited in its nature, purpose, and customary time and place of interaction, but the [defendant] encouraged the expansion of that relationship to foster sexual victimization." *Id.* at ¶ 15 (quoting *People v. Valencia*, 257 P.3d 1203, 1207 (Colo. App. 2011)).

¶ 81     A court shouldn't consider a defendant's behavior in preparation for the assault, as it doesn't "encourage the victim 'to enter into a broader relationship primarily for the purpose of sexual victimization.'" *People v. Tunis*, 2013 COA 161, ¶¶ 39-40 (quoting *Gallegos*, ¶ 14).

### 3. The District Court's Factual Findings Don't Support the Conclusion that Burkhalter Promoted a Relationship with the Victim for the Purpose of Sexual Victimization

¶ 82     While we agree with the district court's finding that the evidence doesn't support a conclusion that Burkhalter "began the relationship with [the victim] for the purpose of sexual victimization,

as opposed to simply for sexual gratification," we disagree with its conclusion that Burkhalter "promoted" a relationship with the victim for two reasons.

¶ 83     First, as the court found, Burkhalter engaged in increasingly sexualized advances toward the victim, including by inserting "sexual overtones and advances into his text conversations" with the victim and initiating "inappropriate sexual contact with the victim almost immediately upon meeting her." But because Burkhalter didn't have a relationship with the victim outside of the encounter that ultimately ended in her assault, those actions amounted to behaviors in preparation for the assault. *See Tunis*, ¶ 40.

¶ 84     Second, the "taunting memes" that Burkhalter sent the victim after the assault don't support the district court's conclusion that Burkhalter "promoted" a relationship with the victim. To start, we are skeptical that a court can properly consider evidence from *after* a sexual assault when determining whether a defendant "promoted a relationship" with the victim. *See Uribe-Sanchez v. People*, 2013 CO 46, ¶ 10 (the definition of "promoted a relationship" explicitly excludes the defendant's behavior during the charged sexual

40

assault); *Tunis*, ¶¶ 39-40.  But even assuming that the court could properly consider this evidence, the memes don't establish that sexual *victimization* was the *primary* motivating factor behind Burkhalter's relationship with the victim.  *See Lopez*, ¶ 8.

¶ 85    Thus, there was no evidence that Burkhalter promoted a relationship with the victim for the primary purpose of sexual victimization.  The SVP designation must therefore be vacated.

### III.    Disposition

¶ 86    We affirm the judgment.  We vacate the SVP designation and remand for correction of the mittimus.

JUDGE DUNN and JUDGE HARRIS concur.

41